## THE LOUISIANA.[1]

### THE NEW ORLEANS.

MILLARD *v.* THE NEW ORLEANS. NATIONAL STORAGE CO. *v.* THE LOUISIANA. VAN WIE *v.* SAME. NEW YORK HARBOR TOW-BOAT CO. *v.* SAME.

(*District Court, S. D. New York.* March 24, 1888.)

SALVAGE—FIRE ON PIER—TOWING VESSELS INTO STREAM—APPORTIONMENT OF AWARD.

On the afternoon of January 29, 1887, a fire broke out on the bulkhead adjoining piers 8 and 9, North river, in the city of New York, and spread with great rapidity along pier 9. The steam-ship Louisiana lay moored on the northerly side of this pier, and the steam-ship New Orleans on the southerly side, and both vessels caught fire. Two tugs hauled the Louisiana into the stream, and two others assisted in putting out the fire. Two other tugs hauled out the New Orleans: one of them rendering but slight service was not a party herein. The steam-ships were in great danger if they remained long at the pier. There was at no time any special peril to the tugs. The Louisiana and cargo were worth from $300,000 to $400,000; the New Orleans was worth $130,000. The above suits were brought by the various owners of the tugs to recover salvage. *Held*, that the Louisiana should pay $2,000 as salvage to the four tugs which assisted her. viz., $1,400 to those that hauled her out, and $600 to the others; and that the New Orleans, whose danger was greater, though her value less, should pay the same to the libelant's tug; the awards to be divided three-fourths to the owners, one-fourth to master and crew.

In Admiralty. Libel for salvage.
*George H. Bruce*, for storage company.
*Wilcox, Adams & Macklin*, for Millard.
*John E. Parsons*, for claimants.

BROWN, J. The above libels were filed to recover for salvage services rendered to the steam-ships Louisiana and New Orleans on the afternoon of January 29, 1887. At about 4 o'clock of that day a fire broke out among some bales of cotton upon the bulkhead that adjoins piers 8 and 9, North river. The New Orleans lay moored, bows out, on the southerly side of pier 9; the Louisiana, bows out, moored on the northerly side. The fire spread with great rapidity along pier 9, and both steamers caught fire, and were considerably damaged. The cost of repairing the New Orleans was about $15,000; the Louisiana, about $7,500. Both were hauled out as soon as possible; the steam-tugs Communipaw,

---

[1] Reported by Edw. G. Benedict, Esq., of the New York bar.

Lewis Pulver, Geo. H. Starrs, and Baltic, taking part in the removal of the Louisiana, and in putting out the fire, and the steam-tug Edwin H. Millard, and another tug not represented in this action, in hauling out the New Orleans. The testimony taken is voluminous, and the views of the parties as to the merits of the claims are widely divergent. It would be unprofitable to refer here to the details of the testimony. The Louisiana was partly loaded, and the value of the ship and cargo at the time was from $300,000 to $400,000; the value of the New Orleans was about $130,000. Next to the value of the vessels, the most important element was the imminent danger to which they were exposed. On this point I have no doubt that there was the most urgent necessity for immediate removal. Neither could have remained where they were without at least very heavy damage. The Louisiana, while she lay next the burning pier, though she had large means, in pumps and hose, for putting out fire, could not have used them effectively there. Several tugs were sent instantly to the seat of danger upon telegraphic calls for assistance; others happened to be near at hand, whose services were called for, and instantly rendered. These services were continued from one to two hours. Three tugs, the Chancellor, Cheney, and Bayonne, which had first endeavored to assist the New Orleans, had failed, when the Millard came to her assistance. It is doubtful whether any other competent tugs at that moment were present and available for her use, except the Lennox, with which a settlement was made without litigation. Others appeared shortly after. The situation was such that there was no immediate or considerable danger to the tugs in rendering assistance to either vessel; and the evidence, I think, shows that at least shortly after the tugs here represented commenced their services a number of other tugs arrived ready and anxious to render any aid desired. Two others, the Fletcher and the Garrett, seem to have been present about the time the Millard arrived. But considering that the officers of the New Orleans had been pressing for immediate help; that the previous efforts of the Chancellor, the Cheney, and the Bayonne had been ineffectual, it must be inferred that the Fletcher and the Garrett, if there at the time the Millard arrived, or before, were either unwilling to take hold, or were deemed insufficient; otherwise it is not credible that their services would not have been used. The suggestion that the New Orleans could safely lie on the south side of the slip in the berth where the Chancellor had been, and from which the latter had fled in haste, and that removal to that berth was all that was desired or needed by the New Orleans, I regard as chimerical. The Communipaw was the first to come to the rescue of the Louisiana, and the Pulver soon followed; they together pulled her away by a hawser from the burning dock. The Baltic and the Starrs soon went alongside; they were necessary to keep her from drifting away with the tide or against other vessels; and both, at the master's request, played upon the fire and assisted in putting it out; the Starrs being most serviceable for that purpose, but arriving later. Although there was no special danger to any of the tugs in rendering their assistance, there is always some danger to tugs in going in the immediate vicinity of burn-

ing wharves or ships, from a variety of causes. The ordinary insurance is thereby forfeited, in case of loss while rendering such services. The element of danger to the tugs cannot be wholly ignored. The chief considerations, however, in this case, in favor of the tugs, are the urgent necessity of immediate aid to the steam-ships, and the certainty of very large loss unless they had been towed away at once. Every minute's additional delay in the removal of the steamers would probably have cost them from $500 to $1,000 additional damage. On the other hand, there was no considerable difficulty or danger to the tugs or to the men in rendering their services; and very shortly after these tugs came, other tugs arrived, which would have been glad to render similar, though somewhat later, services.

The general principles that should guide in making up a salvage award are stated by Mr. Justice BRADLEY in the case of *The Suliote*, 5 Fed. Rep. 99, as follows:

"Salvage is the reward granted for saving the property of the unfortunate, and should not exceed what is necessary to insure the most prompt, energetic, and daring effort of those who have it in their power to furnish aid and succor. Anything beyond that would be foreign to the purpose and principle of salvage. Anything short of it would not secure its objects."

Bearing this principle in mind in both its aspects, I find, upon all the evidence, that $2,000 will be a just award to be paid by the Louisiana. Though the New Orleans was of much less value, she was in greater danger, from the strong north-east wind that blew the fire directly towards her. I allow $2,000 to be paid by her to the Millard, in addition to the small sum already paid in settlement with the Lennox for the minor service of the latter. The sum to be paid by the Louisiana will be divided among the several tugs that assisted her as follows: To the Communipaw, $800; to the Pulver, $600; to the Starrs, $300; and to the Baltic, $300. Of the amounts awarded to each tug, three-fourths will be paid to the owners, and one-fourth to the master and crew, in the following proportions: Four parts thereof to the master or pilot; two parts to the mate or foreman; the same to the chief engineer, and one part to each of the other hands. See *Markham* v. *Simpson*, 22 Fed. Rep. 743.

Decrees, with costs, may be entered accordingly.